In Re: CONDEMNATION BY the RE-DEVELOPMENT AUTHORITY OF LAWRENCE COUNTY, Pennsylvania in Fee Simple, ABSOLUTE TITLE OF LAND OF David C. HAMILTON situate in Neshannock Township, Lawrence County, Pennsylvania, being Parcel I.D. # 25–168200 for the Millennium Park Redevelopment Project

Appeal of: Estate of David C. Hamilton.

In Re: Condemnation by the Redevelopment Authority of Lawrence County, Pennsylvania in Fee Simple, Absolute Title of Land of Thomas R. and Christy L. Whittaker situate in Neshannock Township, Lawrence County, Pennsylvania, being Parcel I.D. # 25–168201 and # 25–438301 for the Millennium Redevelopment Park Project

Appeal of: Thomas R. Whittaker and Christy L. Whittaker.

In Re: Condemnation by the Redevelopment Authority of Lawrence County, Pennsylvania in Fee Simple, Absolute Title of Land of David C. Hamilton, situate in Neshannock Township, Lawrence County, Pennsylvania, being Parcel I.D. # 25–168200 for the Millennium Park Redevelopment Project

Appeal of: Redevelopment Authority of Lawrence County

In Re: Condemnation by the Redevelopment Authority of Lawrence County, Pennsylvania in Fee Simple, Absolute Title of Land of Thomas R. and Christy L. Whittaker, situate in Neshannock Township, Lawrence County, Pennsylvania, being Parcel I.D. # 25–168201 and # 25–438301 for the Millennium Redevelopment Park Project

Appeal of: Redevelopment Authority of Lawrence County.

Commonwealth Court of Pennsylvania.

Argued May 7, 2008.

Decided Dec. 22, 2008.

Michael K. Parrish, Pittsburgh, for designated appellant, Estate of David C. Hamilton, Thomas R. Whittaker and Christy L. Whittaker.

Samuel P. Kamin, Pittsburgh, for appellee, Redevelopment Authority of Lawrence County.

BEFORE: LEADBETTER, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY President Judge LEADBETTER.

In consolidated appeals from separate condemnations, the Estate of David Hamilton, and Thomas R. Whittaker together with his wife, Christy L. Whittaker, challenge the order of the Court of Common Pleas of Lawrence County (trial court), which overruled in part their preliminary objections to the legality of the condemnations. In a cross-appeal, the condemnor, Redevelopment Authority of Lawrence County (RALC), challenges common pleas' order insofar as it sustained the condemnees' preliminary objections to the adequacy of the bond posted with the declaration of taking.

In September of 2004, RALC filed separate declarations of taking, pursuant to the authority provided under the Urban Redevelopment Law (URL),[1] condemning the Hamilton and the Whittaker properties for the purpose of developing a high technology business park. At the time of the condemnation, David Hamilton owned 2.5 acres, on which he maintained a structure used for both residential and industrial purposes,[2] and the Whittakers owned approximately 84 acres, where they lived with their children in a home constructed in 2002. These two properties are located within an approximately 530–acre area, identified as a prime location for industrial

---

1. Act of May 24, 1945, P.L. 991, *as amended,* 35 P.S. §§ 1701–1719.1.

2. Hamilton maintained an orthodontic office, an appliance manufacturing facility and a residential rental unit.

development, and labeled "Millenium Park," by the Lawrence County Economic Development Corporation (LCEDC), a private non-profit corporation formed by the County to reverse a loss of its industrial tax base.

In March of 2003, the County created the redevelopment authority, RALC, which then undertook in conjunction with the County Planning Commission and the County Commissioners, pursuant to the provisions in the URL, to designate a portion of the Millenium Park acreage as a "Redevelopment Area" and to draft a "Redevelopment Area Plan" for what is known as "Millenium Park Phase II." The May 2004–certification of the Millenium Park Phase II (MPII) acreage encompassed six properties, four of which had already been purchased by the LCEDC between August of 2003 and March of 2004, and the improvements on those four properties had been razed. Consequently, at the time the Planning Commission found the Area to be blighted only the two properties owned by condemnees remained to be acquired.

Meanwhile, RALC and the LCEDC executed a written agreement calling for properties in the redevelopment area condemned by RALC to be conveyed to LCEDC and for LCEDC to cover RALC's expenses. Subsequently, asserting that condemnees' properties, inasmuch as they were maintained in economically undesirable uses and, therefore, qualified as blighted under provisions of the URL, RALC exercised its power of eminent domain under the URL to condemn the properties. RALC filed its declaration of taking, citing Section 9 of the URL.

Condemnees filed preliminary objections[3] contending (1) that the procedures required under the URL were not followed, (2) that their properties are neither individually blighted nor in a blighted redevelopment area, (3) that the taking violated the constitutions of the United States and Pennsylvania insofar as RALC, in declaring the properties blighted, acted pretextually with an intent to facilitate private commercial/industrial development by the LCEDC, a private entity, and (4) that RALC filed an insufficient bond with the declaration of taking. Following a twelve-day hearing, common pleas overruled the preliminary objections challenging the legality of the taking and sustained the objection to the sufficiency of the bond.

Common pleas deemed it "significant that the LCEDC owned or was in the process of acquiring MPII properties prior to formal creation of a certified redevelopment area and subsequent condemnations." Common pleas opined:

> The argument that Condemnees' properties were within a blighted redevelopment area would seem specious where the ultimate "developer" of said redevelopment area already possessed all of the MPII properties apart from Condemnees' properties. Accordingly, this Court would be hard pressed to determine that the relevant properties were properly condemned merely because they fell within the relevant redevelopment area.

Common pleas' op. at 21. Based on the conclusion "that the LCEDC had physical control of 88% of the MPII prior to the creation of a redevelopment plan," common pleas stated that "Condemnors must demonstrate a finding that condemnees' properties are individually blighted."

---

3. Under Section 406 of the Eminent Domain Code, Act of June 22, 1964, P.L. 84, *as amended*, 26 P.S. § 1–406, applicable at the time of the instant condemnation, later repealed by the Act of May 4, 2006, P.L. 112 and reenacted as 26 Pa.C.S. § 306, preliminary objections to the declaration of taking are the exclusive method for challenging the legality of the taking and the sufficiency of the security.

Common pleas' op. at 22 n. 15. In evaluating RALC's assertion that the properties qualified as blighted because they were maintained in socially or economically undesirable uses, the court rejected the notion that single family residential use is socially undesirable, calling such an assertion "capricious and not in good faith." But the court concluded that condemnees failed to establish bad faith with regard to RALC's determination that the properties were maintained in economically undesirable uses. Thus the court upheld the legality of the taking. Finally, common pleas ordered that RALC post security in the form of cash or surety rather than the "naked" bond filed with the declaration of taking. The parties filed the instant cross-appeals.

On appeal, condemnees reassert the contentions pressed before common pleas. They argue that the properties are neither blighted nor located in a blighted redevelopment area as those terms are used in the URL, that common pleas misinterpreted and misapplied the URL to sustain the condemnation where RALC acted pretextually to condemn on behalf of LCEDC, a private entity, for private economic benefit and without adhering to the process prescribed under the URL. In its cross-appeal, RALC challenges the finding that it had not provided evidence of sufficient financial security to compensate for the takings.

 In reviewing a common pleas court decision on preliminary objections to a condemnation, our inquiry looks to whether sufficient evidence supports the findings of fact or whether the court committed an error of law. Review of a certification of blight and subsequent taking is limited to a determination that the [redevelopment authority] has not acted in bad faith, not acted arbitrarily, has followed the statutory procedures, and has not violated any constitutional safeguards. *See Appeal of Redev. Auth. of Phila.*, 595 Pa. 241, 247, 938 A.2d 341, 345 (2007). *See also Crawford v. Redev. Auth of Fayette County*, 418 Pa. 549, 554, 211 A.2d 866, 868 (1965).

In Section 2 of the URL, our General Assembly expressed its determination that the elimination of blight through economically and socially sound redevelopment serves a public purpose that justifies the acquisition of private property by the exercise of the power of eminent domain.[4] *See Belovsky v. Redev. Auth. of Phila.*, 357 Pa. 329, 54 A.2d 277 (1947) (stating that the taking of private land deemed blighted is proper because the statute's purpose was "the clearance, reconstruction and rehabilitation of the blighted area" and the separate, subsequent transfer to a private developer was "purely incidental to the accomplishment of the real or fundamental purpose."). The URL authorizes condemnation by a Redevelopment Authority in two separate Sections. Section 9 conveys

---

4. In relevant part, Section 2 states:

[I]t is hereby declared to be the policy of the Commonwealth of Pennsylvania to promote the health, safety and welfare of the inhabitants thereof by the creation of bodies corporate and politic to be known as Redevelopment Authorities, which shall exist and operate for the public purposes of the elimination of blighted areas through economically and socially sound redevelopment of such areas, as provided by this act, in conformity with the comprehensive general plan of their respective municipalities for residential, recreational, commercial, industrial or other purposes, and otherwise encouraging the provision of healthful homes, a decent living environment and adequate places of employment of the people of this Commonwealth. Such purposes are hereby declared to be public uses for which public money may be spent and private property may be acquired by the exercise of the power of eminent domain.

35 P.S. § 1702.

the power of eminent domain to condemn property within a redevelopment area, stating in pertinent part:

An Authority['s] ... powers shall include all powers necessary or appropriate to carry out and effectuate the purposes and provisions of this act, including the following powers in addition to those herein otherwise granted:

. . . .

(i) To acquire by eminent domain any real property, including improvements and fixtures for the public purposes set forth in this act, in the manner hereafter provided, *except real property located outside a redevelopment area;*

35 P.S. § 1709(i) (emphasis added). Where property targeted for redevelopment is located outside a redevelopment area, Section 12.1, added by the Act of June 23, 1978, P.L. 556, *as amended,* 35 P.S. § 1712.1, authorizes condemnation, in pertinent part, providing:

Notwithstanding any other provision of this act, any Redevelopment Authority shall have the power to acquire by purchase, gift, bequest, eminent domain or otherwise, any blighted property as defined in this section, either within or outside of a certified redevelopment area and, further, shall have the power to hold, clear, manage and/or dispose of said property for residential and related reuse and commercial or industrial reuse. This power shall be exercised in accord with the procedures set forth in this section.

Thus, a Redevelopment Authority may condemn within a redevelopment area properly certified under the relevant provisions of the URL or it may condemn individual properties deemed blighted in accordance specifically with Section 12.1.

With respect to property within a redevelopment area, Section 3 of the URL defines "redevelopment area" as "any area, whether improved or unimproved, which a planning commission may find to be blighted because of the existence of the conditions enumerated in section two of this act so as to require redevelopment under the provisions of this act." 35 P.S. § 1703(n). Section 2 provides that areas may "become blighted because of the unsafe, unsanitary, inadequate or over-crowded condition of the dwellings therein, or because of inadequate planning of the area, or excessive land coverage by the buildings thereon, or the lack of proper light and air and open space, or because of the defective design and arrangement of the buildings thereon, or faulty street or lot layout, *or economically or socially undesirable land uses.*" 35 P.S. § 1702(a) (emphasis added). Section 10 establishes that the municipality's planning commission shall certify a redevelopment area, and it prescribes the requisite process for the preparation and adoption of a redevelopment plan.[5]

With respect to property qualifying as "blighted" for purposes of condemnation outside of a redevelopment area, Section 12.1, in relevant part, specifically lists the

---

**5.** Our Supreme Court summarized the process set forth at length in Section 10 as follows:

[T]he Redevelopment Law provides for designation of areas in need of redevelopment as a first step, to be followed by preparation of detailed proposals for redevelopment, 35 P.S. § 1710(a)-(c), submission of the proposals to the planning commission for recommendations, 35 P.S. § 1710(e), and submission of the proposals

and planning commission recommendations to the governing body for approval. Before deciding to approve or reject the proposal, the governing body is required to hold public hearings on the redevelopment proposal and give notice of such hearings by newspaper publication, 35 P.S. § 1710(g).

*In re Condemnation by the Urban Redev. Auth. of Pittsburgh,* 527 Pa. 550, 561, 594 A.2d 1375, 1380 (1991).

qualifying criteria, which may be summarized as those conditions ordinarily associated with a severely deteriorated property such as those constituting a public nuisance, unfit for human habitation, lacking basic utilities, vacant, abandoned or unoccupied and tax delinquent. Section 12.1 does not contain language such as that found in Section 2, characterizing blighted property as that maintained in "economically or socially undesirable land uses." Section 12.1 further provides for a process of certification establishing that a targeted property meets the criteria, providing notice to the property owner and an opportunity to contest the blight certification. Acquisition of blighted property under Section 12.1 does not require the adoption of a redevelopment plan as set forth in Section 10. *See* 35 P.S. § 1712.1(f).

Condemnees accurately assert that their properties do not qualify and, indeed, have not been certified as blighted under Section 12.1. Therefore, the condemnation is justified under the URL only if the Redevelopment Area meets the statutory criteria for such characterization and all of the required procedures under the URL were followed.[6]

The Redevelopment Area consists of six properties, none of which are in a condition that any reasonable person could consider blighted in the ordinarily understood sense of severely deteriorated, slum or nuisance conditions. Condemnor concedes as much. RALC acknowledges in its brief to this court that common pleas properly noted in its Opinion "that [Redevelopment Authority] and the associated decision makers determined [that] Condemnees' properties

are blighted under the theory that, as utilized, said properties are economically undesirable." Appellee/Cross–Appellant's Brief at 19–20. RALC further states that "the *physical* condition of the project area properties" was "a matter not at issue" and, therefore, improperly discussed (albeit harmlessly) by common pleas in its analysis. RALC makes perfectly clear that it considers the properties properly qualified for certification as a Redevelopment Area because they are maintained in economically undesirable uses insofar as they are not used for the permitted industrial purposes that represent the highest and best use. As summarized in common pleas' opinion, the testimony indicates that the Planning Commission, governing body and RALC strongly perceived condemnees' properties as especially well-suited to serve the need for a large shovel-ready site that, when put to use by a large industrial business, would provide jobs and economic opportunity in the community. Thus, the residential use of condemnees' properties was considered an impediment to industrial development that would be more economically advantageous to the entire community.

 RALC maintains that the designation of blight based on this determination cannot be questioned other than for fraud or bad faith in the determination. While it is generally true that the findings underlying the determination of blight must be afforded deference, such deference is not called for with respect to legal error arising from the application of a flawed understanding as to what must be shown in

---

6. As condemnees assert, common pleas erred insofar as it looked to whether condemnees' individual properties were maintained in economically undesirable uses so as to qualify as blighted for purpose of condemnation under the URL. RALC condemned the properties under Section 9, which authorizes condemnation of properties only within a redevelop- ment area. As noted above, the term "economically undesirable use" is applicable only to an areawide blight determination under Section 9; it is not applicable to the blight certification of individual properties, which must be determined under the specific criteria listed in Section 12.1.

order to establish the statutory criteria qualifying an area or property as blighted. Our consideration as to what constitutes "economically undesirable" as that term is used in the URL is a question of law on which we need not defer to the municipal decision-makers nor to common pleas.

■ The critical issue before us is whether the URL, in specifying "economically undesirable use" among the criteria listed in Section 2 that render an area blighted, opens the door to a condemnation for purely "economic development." In *Kelo v. City of New London*, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), the United States Supreme Court upheld a condemnation of residential buildings that were clearly not blighted in the sense of dilapidated but were located in a certified redevelopment area targeted for revitalization pursuant to a carefully considered plan, which included razing the residences to build a pharmaceutical research facility. The redevelopment authority had complied with the relevant municipal redevelopment statute, thus conferring a presumption of legitimacy on the selection of the geographic area targeted for redevelopment. *See id.* at 483, 125 S.Ct. 2655 ("Those who govern the City were not confronted with the need to remove blight in the Fort Trumbull area, but their determination that the area was sufficiently distressed to justify a program of economic rejuvenation is entitled to our deference"). The only question before the Court was whether the "economic development" of the site constituted a public purpose sufficient to justify the condemnation under the constraints of the Fifth Amendment of the United States Constitution. The Court answered this question in the affirmative, stating: "promoting economic development is a traditional and long accepted function of government" and "there is, moreover, no principled way of distinguishing economic development from other public purposes that we have recog-

nized." *Id.* at 484, 125 S.Ct. 2655. The Court nevertheless recognized that, while the relevant local redevelopment statute opened the door to a taking for purely economic development, nothing precluded a state from imposing stricter public use requirements than that imposed under the federal baseline. We conclude that our Pennsylvania legislature did just that; proper construction of the URL does not authorize the condemnation of property (lacking the ordinarily understood indicia of blight), such as that at issue here, for purely economic development.

The term "economically undesirable land uses," as used in Section 2 of the URL, does not mean property that is merely put to a use other than the most economically profitable. Such an understanding of the term fails to focus the inquiry on the actual condition of the properties labeled as "blighted" and instead improperly focuses the inquiry on a comparison of the present use with the proposed redevelopment use. The terms in Section 2, such as "unsafe, unsanitary, overcrowded," are not relative descriptors that mean less safe, less sanitary or more crowded; rather, the terms describe actual conditions of deterioration. In order for an area comprising several properties to qualify as unsafe, unsanitary or overcrowded, the area must contain at least some properties in a condition that a reasonable person would conclude met the ordinarily understood meaning of these terms. We construe "economically undesirable" in the same manner, as describing an actual, objectively negative use of the property rather than merely a use relatively less profitable than another. *Cf. Schenck v. Pittsburgh*, 364 Pa. 31, 35, 70 A.2d 612, 614 (1950) (noting that economic undesirability was established by "continuous reduction in the appraised values of the properties for tax purposes").

Our conclusion, that the criteria qualifying an area as blighted must be ascertained by viewing the condition of the targeted area itself under a reasonable person standard rather than considering solely the anticipated benefit from the intended future use, flows logically from the starting premise that the public purpose underlying a condemnation under the URL is the "elimination of blighted areas." *See* 35 P.S. § 1702. *See also Appeal of Redev. Auth of Phila.*, 595 Pa. at 249, 938 A.2d at 346 (stating "The elimination of blight is a valid public purpose that, in the absence of bad faith, is completely separate from any [particular] use of the property subsequent to the taking."). As Justice O'Connor recognized in her dissenting opinion in *Kelo*, where the public interest is served by eliminating a pre-condemnation use that affirmatively inflicts a harm on society and thus directly achieves a public benefit, it will not matter that the property is ultimately turned over to private use; however, "if predicted (or even guaranteed) positive side-effects are enough to render transfer from one private party to another constitutional, then the words "for public use" do not realistically exclude any takings, and thus do not exert any constraint on the eminent domain power." *Id.* at 500–01, 125 S.Ct. 2655 (dissenting op., J. O'Connor).

In the present case, Linda Nitch, the Executive Director of the LCEDC and a member of the County Planning Commission at the time the Commission certified the Redevelopment Area, testified that she considered the use of the properties to be economically undesirable because the "area was not being utilized to its full potential from an industrial standpoint." Hearing on June 21, 2006, N.T. at 53. In testimony at the May 11, 2004 hearing before the Lawrence County Board of Commissioners, James Gagliano, Jr., the County's Planning Director and the Director of RALC, agreed that no physical condition of *any* property in the Redevelopment Area rendered the Area blighted but that insofar as the Area is zoned for industrial uses, the present uses constitute an underutilization of property that could be put to more lucrative use. N.T. at 31, 33. Mr. Gagliano further testified as follows:

Q: Now, you have indicated several times to me that we can't ignore the chip manufacturing facility that you want to place here because they're linked together. My question is: Which came first, your desire to build a chip manufacturing or your decision that this property owned by Hamilton and the Whittakers was blighted?

A: Was blighted? This property has been identified for a number of years, as again, through the comprehensive plan as a prime developable site for non-residential development.

. . . .

Q: If you had not identified a chip manufacturing facility that you would like to place on this particular property, would you have any complaints about the existing use of the Whittaker and the Hamilton properties?

A: As a Redevelopment Authority?

Q: As a Redevelopment Authority.

A: No.

Q: So the driving force behind the whole thing, is somebody's desire to develop the property?

A: Economic development activities.

N.T. at 41 –2, 45. In testimony before common pleas, Dennis Alduk, Secretary of RALC, in answer to a series of questions concerning whether the uses within the Redevelopment Area were economically undesirable, stated that the undesirability arose because present uses frustrated the ability to take advantage of opportunities

for industrial development that would provide jobs. Hearing on January 27, 2006, N.T. at 171–73, 176–77. The "Blighting Conditions Report" attached to the "Redevelopment Area Proposal" identifies the conditions constituting blight as: land uses other than the permitted industrial uses; failing to meet the goal and objectives for industrial development as set forth in the Comprehensive Plan; inadequate access for development; economically undesirable land uses; structures located an a manner "defective in meeting prime developable opportunities"; several "unsafe and unsanitary" structures (a contention subsequently abandoned); and the existence of land locked parcels.

■ We conclude that the County Planning Commission failed to apply the proper standard for determining whether the properties in the Area were maintained in economically undesirable uses and, hence, improperly certified the Area as blighted. The only apparent criteria used to determine the economic undesirability of the uses was the comparison with the intended industrial uses and the conclusion based on that comparison that the properties in the Area could be put to a more lucrative use. The record leaves no room for any conclusion that the properties in the Area specifically inflict any affirmative harm on the community due to the physical condition or the use of those properties. The desire to put the properties to industrial use does not render their present use undesirable within the meaning of Section 2 of the URL. We emphasize that this inquiry is directed to the area as a whole sought to be redeveloped. Within any such area, there may be some parcels which do not fit the definition of "undesirable," but which must be taken in order to accomplish the redevelopment of a generally undesirable area. By the same token, one or two undesirable parcels will not subject to condemnation under the URL a large area of otherwise productively used properties.

What is required is an assessment which supports the conclusion, under the standards described above, that the area as a whole is in need of redevelopment.

Inasmuch as the properties in the Redevelopment Area cannot be considered blighted due to the economic undesirability of the present uses and where no physical conditions of blight exist, the public purpose, i.e., elimination of blight, is absent and the condemnation is not justified. Common pleas erred in overruling the condemnees' preliminary objections to the legality of the taking. Accordingly, we reverse common pleas' order insofar as it overruled the preliminary objections to the taking. The issue of the adequacy of the posted security having become moot, we vacate common pleas' order directing security in the form of cash or bond.

### O R D E R

AND NOW, this 22nd day of December, 2008, the order of the Court of Common Pleas of Lawrence County in the above captioned matter, overruling the preliminary objections to the legality of the taking, is hereby REVERSED and the preliminary objections are SUSTAINED. Common pleas' order sustaining the preliminary objection to the sufficiency of the bond is hereby VACATED and that objection is dismissed as MOOT.